OAKLAND COUNTY PROSECUTING ATTORNEY v
DEPARTMENT OF CORRECTIONS

Docket No. 67134. Argued May 6, 1981 (Calendar No. 12).—Decided
May 14, 1981.

The Oakland County Prosecuting Attorney brought an action
against the Department of Corrections and the Director of the
Department of Corrections for a declaratory judgment that the
Prison Overcrowding Emergency Powers Act, 1980 PA 519, is
unconstitutional. The Oakland Circuit Court, Robert L. Temp-
lin, J., dismissed the complaint. The Court of Appeals, V. J.
Brennan, P.J., and R. M. Maher and D. C. Riley, JJ., perempto-
rily reversed, on the ground that the statute impermissibly
grants to the Department of Corrections the power to reduce
minimum sentences because the power to commute sentences is
lodged by the constitution exclusively in the Governor, and
enjoined the defendants from implementing the statute (Docket
No. 57297). Defendants appeal. In a per curiam opinion signed
by all except Justice Williams, the Supreme Court *held:*

The statute is constitutional. The constitution authorizes the
Legislature to provide for indeterminate sentences and to pro-
vide for the release of persons imprisoned or detained under
indeterminate sentences. Whether this statute is viewed as
providing for indeterminate sentences in a manner which
retroactively amends an earlier provision for indeterminate
sentences or as providing for the release of persons imprisoned
or detained under indeterminate sentences, the legislation is
within the terms of the constitutional grant of authority. The
legislative history demonstrates that a commutation in deroga-
tion of the Governor's power was not intended; instead the
legislation was part of a broad-based effort at correctional
reform. Although the retroactive reduction of minimum sen-
tences because of prison overcrowding has consequences similar
to commutation, it derives from a wholly separate constitu-
tional grant of power. It is within the constitutional grant of

REFERENCES FOR POINTS IN HEADNOTES
[1-4] 16 Am Jur 2d (Rev), Constitutional Law § 334.
    21 Am Jur 2d, Criminal Law §§ 14, 17, 540, 577, 581, 592, 614.
[3, 4] 16A Am Jur 2d (Rev), Constitutional Law § 644.

authority to the Legislature to provide for the release of persons imprisoned or detained under indeterminate sentences. Further, the Governor remains free to pardon or commute the sentences of individual prisoners as he, in his discretion, feels the circumstances warrant.

Reversed.

Justice Williams dissented in part:

1. Under the constitution the Legislature could prospectively provide for an indeterminate sentence based upon the conditions of release specified in the Prison Overcrowding Emergency Powers Act. A sentencing judge would know that any sentence imposed was liable to future 90-day reductions under the statute, much as the judge can anticipate reductions by the Department of Corrections for "good time" or "special good time". There is no constitutional infirmity in a prospective application of the statute because it does not interfere with the Governor's power to commute after judicial sentencing.

2. The issue in this case is whether the Legislature has the power to mandate the reduction of minimum sentences already judicially imposed. It does not for two reasons. First, the constitution uses the phrase "detention and release", and the two powers must be read together; the Legislature cannot constitutionally provide for the release of persons imprisoned under indeterminate sentences where it could not also provide for their detention. Since it is obvious that the Legislature was not authorized by the constitution to increase the time of detention of persons after judicial sentencing, it also could not shorten the actual term of sentence. It must be assumed that the constitutional provision was intended to be construed prospectively, because a retrospective construction runs contrary to other constitutional provisions. Second, the Prison Overcrowding Emergency Powers Act would usurp the Governor's exclusive power of commutation if it is construed as mandating that the Governor act to reduce sentences which were imposed before the statute was enacted. Therefore, the statute should be construed, to maintain its constitutionality, so that as to sentences imposed before the enactment of the statute the action by the Governor to reduce the sentences is discretionary rather than mandatory. The retroactive application of the Prison Overcrowding Emergency Powers Act is to be viewed as a procedural device for bringing to the Governor's attention problems of prison overcrowding which may be relieved through the discretionary exercise of the commutation power. The Prison Overcrowding Emergency Powers Act is constitutional with respect to sentences imposed after January 26,

1981, but with respect to sentences imposed before that date only insofar as the Governor's actions which trigger the reductions in sentence are discretionary rather than mandatory.

OPINION OF THE COURT

1. CONSTITUTIONAL LAW — PRISONS AND PRISONERS — INDETERMINATE SENTENCES.

The constitutional amendment which gave the Legislature the power to provide for indeterminate sentences and for the detention and release of persons imprisoned under such sentences was intended to give to the Legislature a power which previously was vested exclusively in the judiciary and executive, and whatever infringement or sharing of the Governor's commutation power exists in a statute which falls within its authorization is constitutionally authorized (Const 1963, art 4, § 45; art 5, § 14).

2. CONSTITUTIONAL LAW — PRISONS AND PRISONERS — INDETERMINATE SENTENCES — PRISON OVERCROWDING EMERGENCY POWERS ACT.

The Prison Overcrowding Emergency Powers Act, which authorizes the reduction of established minimum terms of prisoners upon a declaration by the Governor of a state of emergency in excess prison population, is within the power granted in the constitution to the Legislature to provide for indeterminate sentences and for the detention and release of persons imprisoned under such sentences, and thus is constitutional regardless of whether the release of prisoners under the statute is characterized as a commutation (Const 1963, art 4, § 45; MCL 800.71 *et seq.*; MSA 28.1437[1] *et seq.*).

OPINION BY WILLIAMS, J.

3. CONSTITUTIONAL LAW — PRISONS AND PRISONERS — SENTENCE REDUCTION — PRISON OVERCROWDING EMERGENCY POWERS ACT.

*The Prison Overcrowding Emergency Powers Act is constitutional and does not contravene the Governor's exclusive power of commutation with respect to sentences imposed after January 26, 1981, and with respect to sentences imposed before that date only insofar as the Governor's actions which trigger the reductions in sentence are discretionary rather than mandatory (Const 1963, art 4, § 45; art 5, § 14; MCL 800.71 et seq.; MSA 28.1437[1] et seq.).*

4. CONSTITUTIONAL LAW — PRISONS AND PRISONERS — SENTENCE REDUCTION — STATUTES.

*The Legislature is not authorized by the constitution to mandate*

*the reduction of minimum prison sentences already judicially imposed; the powers of detention and release must be read together, and the Legislature cannot provide for the release of a person imprisoned under an indeterminate sentence where it could not provide for detention (Const 1963, art 4, § 45).*

*L. Brooks Patterson,* Prosecuting Attorney, and *Thomas S. Richards,* Assistant Prosecuting Attorney, for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Keith D. Roberts,* Assistant Attorney General, for defendants.

PER CURIAM. The Court of Appeals has held that the Prison Overcrowding Emergency Powers Act, 1980 PA 519,[1] unconstitutionally contravenes the Governor's exclusive commutation power under Const 1963, art 5, § 14. We conclude that the Court of Appeals erred in so holding, and we reverse.

I

1980 PA 519 had its genesis in the Joint Legislative/Executive Task Force on Prison Overcrowding. This task force was convened by the Governor, the Speaker of the House, and the Senate Majority Leader on January 29, 1980, in recognition of the fact that "Michigan is in the midst of a crisis in its prison system"; what was sought was "the most effective but cost-efficient response to this crisis".[2] The task force responded on June 24, 1980, with 14 recommendations, the last of which recommended a statute such as 1980 PA 519:

"To protect the interests of the State and to prevent

---

[1] MCL 800.71 *et seq.;* MSA 28.1437(1) *et seq.*

[2] Report of the Joint Legislative/Executive Task Force on Prison Overcrowding (June 24, 1980), p i.

major disruptions or federal court intervention in our prison system, the Task Force recommends the enactment of a series of 'last-resort' statutory mechanisms that would reduce the prison population to its rate capacity upon a gubernatorial declaration of a State of Emergency in the prisons."[3]

The task force explained its recommendations in these terms:

"Since 1975, Michigan's prisons have been continuously overcrowded by as many as 2,000 prisoners over the system's rated capacity. As a result of this population pressure, the Department has been forced to house prisoners in areas not designed for housing, *e.g.*, recreation and treatment areas and garages. This restricts the availability of rehabilitative and diversionary activities and only serves to aggravate the normally high tension levels found in an institutional environment.

"These living conditions create a situation that invites judicial intervention—a situation occurring on a large scale across the country. In fact, as of April 1, 1980, 19 states were operating their prison systems wholly or partially under court order, and 13 others were facing litigation on the conditions of confinement. Virtually all of this judicial action has occurred since 1974. And, if the anticipated Congressional authorization for the U.S. Justice Department to initiate or become involved in litigation on behalf of state inmates occurs, the instances of judicial intervention are likely to increase at a more rapid pace. A federal court order generally establishes the acceptable conditions that must be met by the state within a specified period of time, regardless of the costs involved or the ability of the state to meet those costs.

"A second implication of an overcrowded prison system, perhaps the most dangerous and costly, is that of prison riot and disruptions. Since January 1, 1980, there has been a major prison riot and a series of minor prison disruptions across the nation. Although, with the

[3] *Ibid.,* p iii.

exception of the New Mexico riot, they have not been serious, they do indicate the prevailing mood of the prison population in this country: unrest. It is the result of this unrest, in terms of human suffering as well as dollars and cents, that a humane society must take every possible step to avoid.

"The Task Force has recommended a realistic course of action for the State to follow in seeking to address these possibilities. However, even the most timely action on these recommendations will not guarantee that one or both of these possibilities will not come to fruition. Therefore, the Task Force is recommending the immediate passage of a mechanism designed to provide a progressively radical course of action to reduce Michigan's prison population. A decision to invoke the provisions of this legislation would be a last ditch effort called into play only if other legislative and executive efforts to reduce prison population do not result in the elimination of overcrowding."[4]

The called-for legislation was introduced as HB 6049 on September 17, 1980, and approved by both Houses. The Governor signed the enactment on January 26, 1981.

In the sections relevant to this litigation, 1980 PA 519 calls for the corrections commission to request the Governor to declare a state of emergency whenever prison population exceeds available bed space for 30 consecutive days;[5] for the Governor to declare the emergency within 15 days thereafter, unless he finds the commission erred; and on this declaration, for the Director of the

---

[4] *Ibid.,* p 22.

[5] "The commission shall request the governor to declare a state of emergency in the state's prisons whenever the population of the prison system exceeds the rated design capacity for 30 consecutive days. In making the request, the commission shall certify the rated design capacity and current population of the prison system and that all administrative actions consistent with applicable state laws and the rules promulgated under those laws have been exhausted in an attempt to reduce the prison population to the rated design capacity." MCL 800.73; MSA 28.1437(3).

Department of Corrections to reduce the minimum terms of those prisoners who have established minimum terms by 90 days.[6] Further reductions occur until population is reduced to 95% of capacity.[7]

## II

On March 30, 1981, the corrections commission notified the Governor that the prison population had exceeded its capacity for 30 consecutive days and requested a declaration of emergency. The declaration has not been made. On April 8, 1981, the Oakland County Prosecutor filed a complaint for declaratory judgment in Oakland Circuit Court which sought a judgment declaring 1980 PA 519 unconstitutional. An order was entered in the circuit court which restrained the Department of Corrections and its director from reducing the minimum terms of sentences under 1980 PA 519. The circuit court then entered an order vacating its temporary restraining order and dismissing the prosecutor's complaint. The prosecutor prevailed, however, on appeal to the Court of Appeals. That Court enjoined the Department of Corrections and its director from implementing 1980 PA 519; it said:

---

[6] "Unless the governor finds within 15 calendar days of the commission's request under section 3 that the commission acted in error, the governor shall declare a prison overcrowding state of emergency within that 15 days and the minimum sentences of all prisoners who have established minimum prison terms shall be reduced by 90 days by the director of the department of corrections." MCL 800.74; MSA 28.1437(4).

[7] "If the actions under section 4 do not reduce the population of the prison system to 95% of the rated design capacity within 90 days of the date of the declaration of the prison overcrowding state of emergency, the minimum sentences of all prisoners incarcerated in state prisons on that date who have established minimum prison terms shall be reduced by 90 days by the director of the department of corrections." MCL 800.75; MSA 28.1437(5).

"1980 PA 519 is unconstitutional. The statute impermissibly grants to the Department of Corrections the power to reduce minimum sentences, in contravention of the Governor's exclusive power to commute sentences under Const 1963, art 5, § 14. Once a valid minimum sentence is imposed by the sentencing court pursuant to the Indeterminate Sentence Act, MCL 769.8; MSA 28.1080, not even that court can change the sentence because the power to commute is lodged in the executive branch of government. See, for example, *Moore v Parole Board,* 379 Mich 624, 642; 154 NW2d 437 (1967) (opinion by ADAMS, J.)."

We granted leave to appeal from this order.

### III

Const 1963, art 5, § 14 provides:

"The governor shall have power to grant reprieves, commutations and pardons after convictions for all offenses, except cases of impeachment, upon such conditions and limitations as he may direct, subject to procedures and regulations prescribed by law. He shall inform the legislature annually of each reprieve, commutation and pardon granted, stating reasons therefor."

The Convention Comment discloses that the only change from the predecessor in the 1908 Constitution was deletion of treason as an offense for which the Governor did not have the authority to reprieve, commute, or pardon. There was, however, some rephrasing. Instead of the current provisions "the governor shall have power", Const 1908, art 6, § 9 provided that "he may grant".

"He may grant reprieves, commutations and pardons after convictions for all offenses, except treason and cases of impeachment, upon such conditions and with such restrictions and limitations as he may think

proper, subject to regulations provided by law relative to the manner of applying for pardons. Upon conviction for treason, he may suspend the execution of the sentence until the case shall be reported to the legislature at its next session, when the legislature shall either pardon or commute the sentence, direct the execution of the sentence or grant a further reprieve. He shall communicate to the legislature at each session information of each case of reprieve, commutation or pardon granted and the reasons therefor."

We have jealously guarded the Governor's prerogative under this constitutional provision. For example, in *People v Freleigh,* 334 Mich 306; 54 NW2d 599 (1952), we reviewed a statute through which the Legislature had granted to a sentencing judge the power to vacate a prior sentence and impose a lesser sentence in light of an enactment giving a sentencing judge discretionary sentencing power in place of previous mandatory sentencing restrictions. We said that this statute violated art 6, § 9:

"The constitution by implication forbids the judiciary to commute a sentence. It does not enable the legislature to pass a law that will infringe upon the exclusive power of the governor to commute a sentence." 334 Mich 310.

In *People v Fox,* 312 Mich 577; 20 NW2d 732 (1945), the question was whether the sentencing judge had the power to subsequently amend his sentence. We said no:

"To hold with defendant under the circumstances of this case that the court has power to amend a sentence after the prisoner has served a part of it would infringe upon the exclusive power of the governor under the Constitution to commute sentence." 312 Mich 581-582.

*In re Casella,* 313 Mich 393; 21 NW2d 175 (1946), involved an alleged parole violator who sought a judicial determination on the question of whether he had violated parole. We said that courts may not interfere with the performance of the administrative parole function. In *People v Cook,* 147 Mich 127; 110 NW 514 (1907), we also emphasized that parole was not a judicial matter. In *Freleigh,* we summarized our holdings in *Cook* and *Casella* as follows:

"We only held that such release by parole was not a commutation of the sentence as such parolees remained under the surveillance of the prison authorities and upon violation of the parole would be returned to the prison to serve the balance of the sentences without any deduction of the time during which they had been released on parole." 334 Mich 309.

In *Cook* we said that a parole does not involve an executive act:

"The design of the indeterminate sentence law is to reform criminals and to convert bad citizens into good citizens, and thus protect society. In order to accomplish this result, the theory is that, when the prisoner has shown by his conduct that he may turn from his criminal career, he should have an opportunity, under favorable circumstances, to make the test. He is in prison for a definite time. Any release therefrom is a favor to him. Such release does not necessarily involve a judicial or an executive act. The release of a prisoner under the old law before the expiration of his term of imprisonment for good behavior has never been held an interference with judicial or executive power.

"The paroled prisoner is regarded as still under the control of the prison authorities. When the prisoner applies for his parole, he applies under the provisions of the law, agrees to its terms, and fully understands that for the misconduct provided in the statute he may be taken back to serve out his term of sentence. This

power of recall is lodged in the warden, subject to review by the board of pardons. The prisoner applies for and obtains his release upon those terms, and no other. They are of the very essence of the indeterminate sentence law." 147 Mich 132.

We remain steadfast in our support of the Governor's exclusive power under art 5, § 14. We do not, however, believe that art 5, § 14 compels the result reached by the Court of Appeals. The Legislature too has a role in establishing the length of sentence, and it has not intruded on the Governor's power with 1980 PA 519.

In *People v Cummings*, 88 Mich 249; 50 NW 310 (1891), we had held that a statute which provided for indeterminate sentences and the release of prisoners under such sentences was unconstitutional because it gave the prison board authority to exercise either the judicial power to determine the term of imprisonment of a defendant or the pardoning power exclusively vested in the Governor. In response to the *Cummings* decision,[8] the 1901 Legislature proposed and, in the November 1902 election, the people ratified an amendment to the constitution giving the Legislature the power to provide for indeterminate sentences and for the detention and release of persons imprisoned under such sentences:

"The legislature may, by law, provide for the indeterminate sentences, so called, as a punishment for crime, on conviction thereof, and for the detention and release of persons imprisoned or detained on said sentences."[9]

---

[8] *Freleigh, supra,* p 308; *Cook, supra,* p 131.

[9] Const 1850, art 4, § 47 as amended in 1902, currently Const 1963, art 4, § 45:

"The legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences."

In considering the instant claim—that a law providing for the release of persons imprisoned under indeterminate sentences impermissibly infringes the Governor's commutation power—we must bear in mind that the circumstances which prompted the adoption of what is currently Const 1963, art 4, § 45 indicate that it was intended to give the Legislature a power which we had previously held was constitutionally and exclusively vested in the judiciary and the executive. As the Court said of § 45's predecessor just five years after it was adopted:

"If that amendment to the Constitution took away any of the power which had theretofore been lodged in the judiciary or the executive, the people exercised a right inherent in them to adopt a constitutional amendment taking away from, or adding to, the powers of either of the departments of government." *Cook, supra,* 132.

If 1980 PA 519 falls within the authorization of § 45, the question of its infringement on the Governor's commutation power is obviated since such infringement or sharing of the commutation power as exists has been constitutionally authorized. Similarly, while it may be possible to distinguish release on parole, when the parolee remains subject to the supervision of and possible recall by the parole board, from release on unconditional pardon or commutation of sentence, and thereby conclude that the executive power has not been infringed,[10] it is unnecessary to do so if the statute is a proper exercise of the power granted by § 45.[11]

[10] See *People v Cook, supra; In re Casella, supra;* but see *People v Cummings, supra,* p 256:

"In any event, this parole system is as obnoxious to the Constitution as an unconditional release by the board would be; and, if they have the power to release on conditions, those conditions may be made so trifling as in fact to be no conditions at all."

[11] 1980 PA 519 is similar in effect to, and identical in terms of the

We are of the opinion that 1980 PA 519 is within the authority granted the Legislature by Const 1963, art 4, § 45, and thus that the statute is constitutional regardless of whether the release of prisoners under the statute is properly characterized as a commutation. Whether it is sound policy to vest the functional equivalent of the commutation power in the Legislature, acting through the parole board, or whether it is sound policy to remedy prison overcrowding by releasing prisoners are questions which can be resolved only in the political forum. 1980 PA 519 embodies the judgment of the Legislature and the Governor; this Court has no authority to review that judgment beyond assessing its constitutionality.

Section 45 authorizes the Legislature to "provide for indeterminate sentences" and to provide for the "release of persons imprisoned or detained under [indeterminate] sentences". Whether 1980 PA 519 is viewed as "provid[ing] for indeterminate sentences" in a manner which retroactively amends an earlier provision for indeterminate sentences or as "provid[ing] for the release of persons imprisoned or detained under [indeterminate] sentences"; the legislation is within the terms of the constitutional grant of authority.

Our decision in *Freleigh,* on which the plaintiff relies, is distinguishable in a manner which clarifies why 1980 PA 519 is within the authority granted in Const 1963, art 4, § 45. In *Freleigh,* the

power exercised by, the Legislature's enactment of a "good time" statute, 1857 PA 99, as first enacted, and later a "special good time" law, 1933 PA 252 (the Legislature gave this statute retroactive effect). These operate effectively to reduce the prisoner's minimum term, as 1980 PA 519 does, by making him or her eligible for parole at an earlier date. What difference exists between the "good time" statutes and 1980 PA 519 is essentially in the factors justifying reduction of the prisoners' minimum terms: in the one case good behavior, in the other prison overcrowding. Yet, as the Court said in *Cook, supra,* and *Casella, supra,* release by parole is not a commutation.

Court reviewed a statute which authorized a sentencing judge to review a prior sentence and to vacate that sentence and impose a lesser sentence if, in the court's judgment, such lesser sentence might have been imposed had a statute giving the sentencing judge discretionary sentencing power instead of the previously effective mandatory sentencing restrictions been in effect at the time of original sentencing. The Court concluded that the statute was an unconstitutional infringement upon the governor's commutation power.

The statute considered in *Freleigh,* unlike 1980 PA 519, did not "provide for * * * release of persons imprisoned or detained under *indeterminate* sentences" (emphasis supplied) since, as the Court there observed, the statute had "retroactive effect upon sentences which were *mandatory*".[12] 1980 PA 519 not only has effect only on indeterminate sentences but also has only the limited effect of changing the period of indeterminacy—the period during which the parole board has authority to act. The statute reviewed in *Freleigh,* on the other hand, authorized the court to vacate the prior sentence entirely and to impose a new sentence. Finally, the Court notes that while Const 1963, art 4, § 45, then Const 1908, art 5, § 28, does not contain language so limiting its effect, it appears from the antecedents prompting the section's adoption that the people contemplated that effect would be given to the section through a parole board or similar agency, as 1980 PA 519 does, rather than through the judiciary, as the statute in *Freleigh* did.

The legislative history available to us demonstrates that a commutation in derogation of the Governor's power was not intended; instead this legislation was part of a broad-based effort at

---

[12] *Freleigh, supra,* p 309 (emphasis supplied).

correctional reform.[13] The purpose of the instant legislation is to reduce the intolerable level of overcrowding which characterizes Michigan's prison system. As part of a broad-based effort at correctional reform, it was intended to deal with a systemwide problem. Although the retroactive reduction of minimum sentences because of prison overcrowding has consequences similar to commutation, it derives from a wholly separate constitutional grant of power. The legislation was within the constitutional grant of authority to the Legislature in art 4, § 45 to "provide for * * * release of persons imprisoned or detained under such sentences". Further, the Legislature has done nothing to directly interfere with the Governor's function; he remains free to pardon or commute the sentences of individual prisoners as he, in his discretion, feels the circumstances warrant.

We have considered the other issues raised by the plaintiff in the Court of Appeals and found them without merit.

We reverse the Court of Appeals judgment and affirm that of the circuit court. The clerk is directed to issue the Court's judgment order forthwith, in accordance with GCR 1963, 866.3(c).

COLEMAN, C.J., and KAVANAGH, LEVIN, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred.

WILLIAMS, J. *(concurring in part; dissenting in part)*. This Court is called upon to decide whether or not the Prison Overcrowding Emergency Powers Act, 1980 PA 519, approved by the Governor,

---

[13] This was not the only task force recommendation acted on by the 1980 Legislature. It also, for example, enacted legislation outlining a site selection process for correctional facilities (1980 PA 303) and placed before the people at the November election a proposal to increase the income tax, with the increase earmarked for prison construction.

January 26, 1981, unconstitutionally contravenes the Governor's exclusive power of commutation under Const 1963, art 5, § 14.

The Legislature presumably acted under the specific power granted them to provide for indeterminate sentences. Const 1963, art 4, § 45 provides:

"The legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences."

1980 PA 519 in § 4 provides:

"Unless the governor finds within 15 calendar days of the commission's request under section 3 that the commission acted in error, the governor shall declare a prison overcrowding state of emergency within that 15 days and the minimum sentences of all prisoners who have established minimum prison terms shall be reduced by 90 days by the director of the department of corrections." MCL 800.74; MSA 28.1437(4).

Under art 4, § 45 there should be no question but that the Legislature could prospectively provide for an indeterminate sentence based upon the conditions of release specified in 1980 PA 519, § 4. See *People v Cook,* 147 Mich 127, 131; 110 NW 514 (1907), upholding the constitutionality of the indeterminate sentencing act, 1905 PA 184. In this manner a sentencing judge would know that any sentence imposed was liable to future 90-day reductions under act 519, much as this same judge can anticipate later "good time" or "special good time" reductions. That being the case, there is no constitutional infirmity in a prospective application of 1980 PA 519 because it does not interfere with the Governor's power to commute *after* judicial sentencing.

The problem actually raised in this case, however, is whether 1980 PA 519 can constitutionally require the Governor to declare a state of emergency, thus setting in motion the process resulting in the reduction of the sentences of persons who were sentenced *before* that act went into effect and whose sentences therefore obviously were not conditioned upon this legislation. The Legislature, as shown by the task force study, was concerned with finding an emergency solution for a lingering condition. In other words, this Court must determine whether the Legislature has the power to mandate the reduction of certain minimum sentences already judicially imposed. It does not for two reasons.

First, art 4, § 45 contemplates prospective legislation only. It provides in pertinent part: *"The legislature may provide for* indeterminate sentences as punishment for crime and for the detention and *release of persons* imprisoned or detained under such sentences". Do the emphasized words mean that § 45 intended that the Legislature may release by reduction of sentence persons already judicially sentenced? While superficially such an interpretation is arguable, closer analysis compels an opposite conclusion. Importantly, the section pertinently reads: "The Legislature may provide * * * for the detention and release". Obviously the powers of "detention" and "release" must be read together, and the Legislature could therefore not provide for "release" where it could not analogously provide for "detention". In other words, since it is obvious that the Legislature was not authorized by § 45 to increase the detention of persons by legislation enacted after their judicial sentencing, then also it could not shorten the actual term of sentence. As a consequence, it must

be assumed that § 45 was intended to be construed prospectively, as a retrospective construction runs contrary to other constitutional provisions.

Second, it is basic statutory interpretation that a statute will not be construed in a way that would make it unconstitutional. Construing art 4, § 45 as done in the preceding paragraph, interpreting 1980 PA 519 as mandating that the Governor shall reduce sentences, imposed at a time when there was no condition of that sentence that it might be reduced because of prison overcrowding, invades the Governor's right of commutation. Art 5, § 14 provides:

"The governor shall have power to grant reprieves, commutations and pardons after convictions for all offenses, except cases of impeachment, upon such conditions and limitations as he may direct, subject to procedures and regulations prescribed by law."

It is clear that § 4 of 1980 PA 519, retroactively mandating a 90-day reduction of minimum sentences, would usurp the Governor's exclusive power of commutation unless it were part of the Legislature's power of indeterminate sentencing, which this opinion has just held it is not where it is retroactive. As a consequence, to maintain the constitutionality of the statute, it is held that the § 4 90-day reduction of sentences imposed before the approval date of 1980 PA 519 is discretionary rather than mandatory as far as the Governor's action is concerned. Viewed in this manner, the retroactive application of 1980 PA 519 is a procedural device for bringing to the Governor's attention prison overcrowding problems which may be relieved through the discretionary exercise of the chief executive's commutation power.

It may be argued that the phrase in art 5, § 14,

which provides that the Governor's commutation power is "subject to procedures and regulations prescribed by law", permits such a law as 1980 PA 519 to infringe on this power. However, that phrase serves only to channel the way in which a Governor exercises his or her discretion to grant commutation, rather than requiring him or her to in fact exercise or not exercise that power with respect to any particular subject.

In conclusion it is held that art 4, § 45 permits 1980 PA 519 to be constitutional with respect to sentences judicially imposed subsequent to January 26, 1981, the date of act 519's approval by the Governor; however, with respect to sentences imposed prior thereto, 1980 PA 519 is constitutional only insofar as the Governor's actions which trigger sentence reductions are discretionary rather than mandatory.