PEOPLE v JACKSON

Docket No. 127997. Submitted October 1, 1991, at Detroit. Decided November 18, 1991, at 9:15 A.M.

Shirley A. Jackson was charged in the Muskegon Circuit Court with bank robbery. The court, Ronald H. Pannucci, J., on motion by the defendant, ordered the dismissal of the charge and, if the dismissal were reversed on appeal, the suppression of evidence of any statements made by the defendant to the police. In ruling in favor of the defendant, the trial court effectively ordered specific performance of an agreement between the prosecutor and the defendant that the defendant would not be prosecuted if she cooperated with the police in the apprehension and conviction of another person implicated in the same robbery. The prosecutor appealed.

The Court of Appeals *held:*

An agreement between a prosecutor and a defendant affecting the disposition of a criminal charge must be reviewed within the context of its function of serving the administration of criminal justice. Under the circumstances of this case, the ends of justice would not be served by, and an abuse of prosecutorial authority would result from, allowing the prosecutor to renege on the promise not to prosecute.

Affirmed.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *Tony Tague,* Prosecuting Attorney, and *Kevin A. Lynch,* Senior Assistant Prosecuting Attorney, for the people.

*Beverly J. Clark,* for the defendant on appeal.

Before: SHEPHERD, P.J., and HOLBROOK, JR., and CONNOR, JJ.

CONNOR, J. The prosecution appeals as of right from a March 30, 1990, order granting defendant's motion to dismiss a charge of bank robbery, MCL

750.531; MSA 28.799. We affirm the trial court's order of dismissal.

On May 5, 1989, Muskegon County Prosecutor Tony Tague and Investigator Detective John Jurkas were on their way to a homicide investigation when they heard a call over the police radio concerning a bank robbery in Muskegon. As Tague and Jurkas drove toward Muskegon, they received information that the car believed to have been involved in the robbery was stopped on Eighth Street. The two men drove to that location, where they found the car in the driveway, along with a number of police vehicles. Jurkas, who was familiar with defendant, observed her at the scene. Only twenty to thirty minutes had elapsed from when the bank-robbery call initially went out over the radio.

After defendant was read her *Miranda*[1] rights, Jurkas asked defendant what was going on. Defendant told Jurkas that she wanted to explain what had occurred and why she was in the predicament in which they found her. According to Jurkas, defendant provided the following account:

> *A. [by Detective Jurkas]:* She told me that—she mentioned a name then—Michael Dede kept calling her up all day long and apparently stayed someplace close to where she lived, and that he wanted a ride over on Sherman. So, eventually, she did agree to give him a ride. She said that she took him over on Sherman, and she parked over in the church lot; and a few minutes later, he came running back to the car, and she saw the gun, and she was scared, because she didn't realize what was going on; and he jumped into the car, pointed the gun at her head and told her to drive.
> She said that when they got up to the intersec-

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

tion of Glenside—Of course, she didn't call it "Glenside." She said "the traffic light." She said there was a pickup truck there, and that Michael Dede was going to shoot the driver of the pickup truck because he wouldn't get out of the way, and she stopped him from doing that.

She told me that she took him and dropped him off over on Winchester. She gave me an address of 1411.

Well, at that point, Mr. Tague was there, and we were talking to her; and I said to her, "Shirley, can you take me over there and show me?" I said, "If you are not involved"—and Mr. Tague agreed —"If you are not involved in this bank robbery and you cooperate with us, we will take care of you"—in other words, she wouldn't be charged.

*Q. [by defense counsel]*: OK. Did Mr. Tague say that?

*A.* I said it. Mr. Tague agreed.

*Q.* All right.

*A.* I said it with the permission, of course, of Mr. Tague.

Defendant cooperated with the police by directing them to the house where she dropped off Dede, and the police were able to enter the house and apprehend Dede, who was still armed, without incident. At the time of his arrest, Dede told Jurkas that defendant was not involved in the crime. Defendant, at this point, was turned over to the Muskegon Police Department, and Jurkas told her: "[C]ooperate with these guys. Give them a taped statement. If you are not involved, you won't be charged."

In a taped statement to police, defendant informed the police about some of the money that had been hidden behind a house on Eighth Street. The police were shown the hiding spot and they recovered the money. Dede later stated that he threw this money, $2,500, on the car seat as he

jumped out of the car, and reiterated that defendant was not involved.

Jurkas was satisfied that defendant had cooperated fully with him in this matter.

Defendant, explained in her testimony at an evidentiary hearing that she had tried to tell the police about the money during the initial conversation, but was told not to interrupt until she had been advised of her rights. She testified that, when talking to Jurkas and Tague, she did not discuss the money because there was no time, "everybody was rushing." Jurkas and Tague were concerned with trying to apprehend Dede at that point; they were aware that some gunshots had been fired. Defendant agreed that she was told that if she cooperated fully and was not involved, she would not be charged. Defendant testified that she informed the police of everything she knew.

Contrary to defendant's expectation, the prosecutor charged her with one count of bank robbery.

Defendant moved to dismiss the charge on the ground that she had an agreement with the prosecutor that she would not be charged with a crime if she cooperated with the authorities. The prosecution argued that defendant's failure to immediately inform the police about the hidden money was a violation of the terms of the agreement and indicated that she was involved in the bank robbery. Furthermore, it was argued that defendant could not show reliance on the agreement because she testified that she would have cooperated with the police regardless of her involvement.

After an evidentiary hearing, the trial court ruled as follows:

> In this case . . . , we have the elected prosecutor and the investigator, both making a promise of no prosecution in the event of full cooperation.

The purpose for this promise is to get information from this driver of the get-away car—at least from the prosecutor's perspective—get this individual who has a weapon, who has used it, off the street as quickly as possible. They certainly should be commended for their efforts. It all happened very quickly, and they were able to—the prosecutor and the law-enforcement agencies involved were able to apprehend this man very quickly.

* * *

The Court is persuaded that the defense has proven that she [defendant] has fully complied with the agreement and that she fully cooperated. She gave the taped statement, told the police where the extra money was, et cetera, et cetera.

This Court is going to order specific performance of an agreement not to prosecute her for the charge involved in this information, that of bank robbery. I am satisfied that the prosecution has done their [sic] job well. In order to do it, they got the guy off the street—maybe someone else has to go free, and that really does bother me. However, we are dealing with the integrity of the criminal justice system and the enforcement of agreements made by the prosecutor—not someone else. This Court must be concerned about that integrity, and making sure that it goes forward and remains with the high standards that are in that office.

The trial court ordered dismissal of the charge of bank robbery with prejudice, but alternatively held that if that decision was reversed, evidence of defendant's statements should be suppressed.

On appeal, the prosecution claims error in the dismissal of this case and in the suppression of defendant's statements. We believe this case was properly dismissed, therefore we do not need to address the prosecution's second issue on appeal concerning the decision, made in the alternative, to suppress defendant's statements.

The authority of a prosecutor to make bargains

with defendants has long been recognized as an essential component of the efficient administration of justice. *Santobello v New York,* 404 US 257, 260-261; 92 S Ct 495; 30 L Ed 2d 427 (1971). Underlying this authority is the broad discretion granted by the constitution and statutes to a prosecutor, as the chief law enforcement officer of a county, to decide whether to prosecute or what charges to file. *People v Williams,* 186 Mich App 606, 609; 465 NW2d 376 (1990); *People v O'Shea,* 149 Mich App 268, 276; 385 NW2d 768 (1986). However, there are some proscriptions on the prosecutor's exercise of discretion. *People v Maxson,* 181 Mich App 133, 134-135; 449 NW2d 422 (1989). Judicial review of decisions by the prosecutor is appropriate where the decisions are unconstitutional, illegal, or ultra vires, *People v Williams, supra* at 611, or where the prosecutor has abused the power confided in him, *People v Williamson,* 138 Mich App 397, 399; 360 NW2d 199 (1984); *People v Nelson,* 66 Mich App 60, 65; 238 NW2d 201 (1975).

In light of the prosecutor's expansive powers and the public interest in maintaining the integrity of the judicial system, agreements between defendants and prosecutors affecting the disposition of criminal charges must be reviewed within the context of their function to serve the administration of criminal justice. *People v Reagan,* 395 Mich 306, 313-314; 235 NW2d 581 (1975). Strict contractual theories and principles peculiar to commercial transactions may not be applicable. *People v Walton,* 176 Mich App 821, 825; 440 NW2d 114 (1989). Thus, our review of the bargain at issue is based on not only the terms of the agreement, but also on whether the ends of justice are served by enforcing its terms.

At the time the prosecution proposed that defen-

dant cooperate with the police in the instant case, the prosecutor was well aware of defendant's apparent involvement in this matter as the driver of the getaway car. With defendant's help, the robber was apprehended, with the bulk of the money still in his possession. Later, defendant voluntarily disclosed the location where the remainder of the money was hidden. As a result of defendant's cooperation, the prosecutor received the benefit of a prompt and safe resolution of this criminal investigation. Under these facts, if the prosecution retained the option to charge the defendant with the crime, we can determine no benefit that was conferred on defendant for her cooperation in reliance on the agreement. If defendant was involved, she had no reason to cooperate if she could still be charged and the information she provided could be used against her to support the charge. If she was not involved, the prosecution should not have charged her, even if she withheld her cooperation. If we accept the prosecutor's interpretation of the agreement, any benefit conferred to defendant would be nonexistent and the bargain illusory.

We believe the prosecutor's attempts to avoid his agreement not to prosecute are reprehensible under the facts of this case, and we find that in order to maintain the integrity of the criminal justice system the charge must be dismissed. Promises of no prosecution were dangled before defendant by experienced law enforcement officials to enlist her full cooperation so these same officials could solve this crime. To allow the prosecutor to charge and try defendant would render the promises meaningless. It would be an abuse of the prosecutor's awesome authority, particularly in light of the disparity in the respective bargaining positions of the defendant and the prosecutor, if

the agreement could be interpreted to permit a retention of the right to institute charges even after the defendant has acted in reliance on the promises and provided her full cooperation. Compare *People v Walton, supra* at 825-826.

Furthermore, we believe some comment is necessary regarding the quantum and quality of the evidence the prosecutor relied on in charging defendant with this crime. The only facts the prosecution has pointed to, which it was not aware of when the agreement was made, concern defendant's hiding of some of the money and her failure to inform the police of this fact until her taped statement was made. The prosecution relies exclusively upon information provided by defendant to the police rather than any evidence that the police discovered independently after additional investigation. Defendant explained that she did not disclose this information initially because the police were urgently and singularly concerned with locating and apprehending the armed robber. Not only do the allegations appear to be insufficient to support the charge of bank robbery, but they also would have required defendant to assess the various ways she could be implicated in the crime without the benefit of legal advice at the same time she was faced with making an immediate decision on whether to cooperate with the police.

We believe the prosecutor's personal involvement in this case makes the agreement binding on him. Compare *People v Gallego,* 430 Mich 443, 452; 424 NW2d 470 (1988). Because we believe that there was an enforceable agreement not to prosecute, the only appropriate remedy is specific enforcement of that agreement. Compare *Gallego, supra.* In addition, the record does not substantiate the prosecution's claim that defendant did not rely on the agreement in providing her cooperation.

Defendant testified that she would have told the truth to the police, not that she would have fully cooperated without the prosecutor's promises.

Affirmed.