Servitto, J.
 

 This case is before us, as on reconsideration granted,
 
 People v. Smith
 
 ,
 
 501 Mich. 851
 
 ,
 
 899 N.W.2d 407
 
 ,
 
 2017 WL 3496629
 
 (2017), to determine whether the trial court's order declaring a portion of defendant's plea agreement void was in error and whether the trial court's subsequent order denying the prosecution's motion to vacate defendant's plea constituted an abuse of discretion. This Court previously dismissed the appeal as moot.
 
 People v. Smith
 
 , unpublished opinion per curiam of the Court of Appeals, issued April 18, 2017 (Docket No. 332288),
 
 2017 WL 1399983
 
 . We now affirm.
 

 We stated the relevant facts in our prior decision:
 

 In May 2015, defendant was involved in an altercation with his ex-wife. As a result, he was charged with domestic violence, MCL 750.81(2) ; malicious destruction of personal property, MCL 750.377a(1)(a)(i) ; felonious assault, MCL 750.82 ; and [carrying a firearm during the commission of a felony (felony-firearm) ], MCL 750.227b. On February 11, 2016, the prosecution and defendant entered into a plea agreement whereby defendant would plead guilty to the charge of malicious destruction of property and agreed both to resign his Senate seat and to refrain from holding public office during his five-year probationary period (which included a ten-month jail term). The remaining charges against the defendant would be dismissed. At the sentencing hearing, the trial court ruled sua sponte that the provisions of the agreement related to defendant's Senate seat violated the constitutional principle of separation of powers and infringed on the people's right to choose their representatives. Accordingly, the trial court declared those portions of the plea agreement void because they "offend[ ] the Constitution of the State of Michigan, [are] contrary to public policy and compromise[ ] the integrity of th[e] court." In all other respects, the court sentenced defendant in accordance with the plea agreement.
 

 The prosecution subsequently moved to vacate defendant's plea. The prosecution argued that in failing to resign, defendant had not complied with the plea agreement and that the prosecution should be permitted to negotiate a new plea deal given the trial court's refusal to enforce the entirety of the original agreement. The trial court denied the prosecution's motion. The trial court acknowledged that while plea agreements are akin to contracts, they must serve the interests of justice. The trial court then held that where the parties had initially indicated that the agreement protected the public and provided for punishment and rehabilitation, enforcement of the agreement without the "offending portion" would serve the interests of justice. [
 
 Smith
 
 , unpub. op. 1-2 (alterations in original). ]
 

 The trial court added that vacating the plea would harm the interests of justice because
 

 [v]acating the plea would violate the fundamental principle that it is the right of the People to elect whom they chose to elect for office by allowing the prosecutor to pressure a member of the legislative branch to resign or face prosecution and likely imprisonment. Vacating the plea would violate the separation of powers set forth in the Michigan [C]onstitution, where only the Senate can discipline or remove one of its members convicted of this type of crime by allowing the prosecutor to pressure a member of the legislative branch to resign and face prosecution and likely imprisonment. Vacating the plea would violate public policy by allowing the prosecutor to dominate the legislative branch of government with the threat of forced resignation.
 

 [And] granting the prosecution's motion to vacate this plea would compromise the Court's integrity by involving it in an act that violates public policy and offends the [C]onstitution.
 

 On remand, we consider the prosecution's appeal of both the trial court's original order voiding a portion of defendant's plea agreement and its order denying the prosecution's motion to vacate defendant's plea.
 

 A trial court's decision whether to set aside an accepted guilty plea is reviewed for an abuse of discretion.
 
 People v. Strong
 
 ,
 
 213 Mich.App. 107
 
 , 112,
 
 539 N.W.2d 736
 
 (1995). An abuse of discretion "occurs when the trial court chooses an outcome that falls outside the range of principled outcomes."
 
 People v. Lee
 
 ,
 
 314 Mich.App. 266
 
 , 272,
 
 886 N.W.2d 185
 
 (2016) (quotation marks and citation omitted). Issues of constitutional law are reviewed de novo.
 
 People v. Benton
 
 ,
 
 294 Mich.App. 191
 
 , 195,
 
 817 N.W.2d 599
 
 (2011).
 

 On appeal, the prosecution argues that the trial court erred by voiding the portion of the plea agreement
 requiring defendant to resign his state Senate seat and to refrain from seeking elective or appointed public office during the five-year probationary period. The prosecution further argues that the trial court abused its discretion by refusing to allow the prosecution to withdraw the plea agreement and proceed to trial. The prosecution specifically contends that the plea agreement did not, as the trial court held, violate the separation of powers and that both defendant
 
 and
 
 the prosecution were entitled to receive the benefit of their end of the negotiated plea agreement.
 
 [1]
 

 The Michigan Constitution provides for the separation of powers: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const. 1963, art. 3, § 2. "While the Constitution provides for three separate branches of government, Const. 1963, art. 3, § 2, the boundaries between these branches
 need not be 'airtight[.]' "
 
 Makowski v. Governor
 
 ,
 
 495 Mich. 465
 
 , 482,
 
 852 N.W.2d 61
 
 (2014) (citations omitted). Indeed, the Michigan Supreme Court has held that this constitutional provision does not require " 'that [the separate branches of government] must be kept
 wholly and entirely separate and distinct, and have no common link or dependence, the one upon the other, in the slightest degree.' "
 
 Kent Co. Prosecutor v. Kent Co. Sheriff (On Rehearing)
 
 ,
 
 428 Mich. 314
 
 , 321-322,
 
 409 N.W.2d 202
 
 (1987), quoting
 
 Local 321, State, Co. & Muni. Workers of America v. Dearborn
 
 ,
 
 311 Mich. 674
 
 , 677,
 
 19 N.W.2d 140
 
 (1945), quoting Story, Constitutional Law (4th ed), p 380. Instead, "[t]he true meaning [of the Separation of Powers Clause] is that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free Constitution."
 
 Kent Co. Prosecutor
 
 .
 
 428 Mich. at 322
 
 ,
 
 409 N.W.2d 202
 
 (quotation marks and citations omitted).
 

 Relevant to the instant matter, the Michigan Constitution contains a clause regarding the qualifications of an individual to serve as part of the state Legislature, including the state Senate:
 

 Each senator and representative must be a citizen of the United States, at least 21 years of age, and an elector of the district he represents. The removal of his domicile from the district shall be deemed a vacation of the office. No person who has been convicted of subversion or who has within the preceding 20 years been convicted of a felony involving a breach of public trust shall be eligible for either house of the legislature. [ Const. 1963, art. 4, § 7.]
 

 The Michigan Constitution identifies additional characteristics that disqualify someone from seeking public office:
 

 A person is ineligible for election or appointment to any state or local elective office of this state and ineligible to hold a position in public employment in this state that is policy-making or that has discretionary authority over public assets if, within the immediately preceding 20 years, the person was convicted of a felony involving
 dishonesty, deceit, fraud, or a breach of the public trust and the conviction was related to the person's official capacity while the person was holding any elective office or position of employment in local, state, or federal government. This requirement is in addition to any other qualification required under this constitution or by law. [ Const 1963, art 11, § 8.]
 

 Further, the Michigan Constitution states how a member of the state Senate can be forcibly removed from that position:
 

 Each house shall be the sole judge of the qualifications, elections and returns of its members, and may, with the concurrence of two-thirds of all the members elected thereto and serving therein, expel a member. The reasons for such expulsion shall be entered in the journal, with the votes and names of the members voting upon the question. No member shall be expelled a second time for the same cause. [ Const. 1963, art. 4, § 16.]
 

 The Michigan Constitution also expressly bars the executive branch of government, to which the prosecution belongs,
 
 People v. Conat
 
 ,
 
 238 Mich.App. 134
 
 , 150,
 
 605 N.W.2d 49
 
 (1999), from expelling members of the other two branches of government: "[The governor] may remove or suspend from office for gross neglect of duty or for corrupt conduct in office, or for any other misfeasance or malfeasance therein, any
 elective or appointive state officer, except legislative or judicial, and shall report the reasons for such removal or suspension to the legislature." Const. 1963, art. 5, § 10.
 

 The language used in the state Constitution is clear: the Constitution specifically describes when an individual is ineligible to run for elective office, including as a state senator, and also reserves to the Legislature the right to determine when its own members should be expelled. The prosecution argues that the voluntary nature of defendant's decision regarding the plea
 agreement rendered the agreement constitutional, but such a view would allow the prosecution, a part of the executive branch, to do indirectly an act that the prosecution is specifically prohibited from doing directly.
 

 There are no Michigan cases that have addressed this issue. However, at least one federal court has considered a nearly identical issue. In
 
 United States v. Richmond
 
 ,
 
 550 F.Supp. 605
 
 , 606 (E.D.N.Y. 1982), the defendant, a member of Congress, entered into a plea agreement requiring that he immediately resign from Congress and withdraw as a candidate for re-election. The United States District Court for the Eastern District of New York held that the plea agreement provisions relating to his then current membership in Congress and his then candidacy for re-election were void because the provisions represented an unconstitutional interference by the executive branch of government with the legislative branch of government (a violation of the separation of powers), the provisions interfered with the rights of the defendant's constituents, and the provisions contravened public policy.
 
 Id
 
 .
 

 The imperative that the people are sovereign in a republican form of government "was embodied in the Constitution by prescribing only a limited number of qualifications for congressional office," and by empowering "the houses of Congress to discipline their members and in extreme cases to expel them by a two-thirds vote."
 
 Id
 
 . at 607. "It was the people of the Congressman's district who were to decide upon his moral and other qualifications, not Congress. A fortiori this inhibition applies to other branches of government."
 
 Id
 
 . As the
 
 Richmond
 
 Court explained, "[j]ust as Congress and the states are prohibited from interfering with the choice of the people for congressional
 office, federal prosecutors may not, directly or indirectly, subvert the people's choice or deny them the opportunity to vote for any candidate."
 
 Id
 
 . at 608.
 

 Similarly, though admittedly not directly on point, the state of Maryland also held that requiring an elected official to refrain from running for public office as a condition of his criminal sentence violated the separation of powers. In
 
 Leopold v. State
 
 ,
 
 216 Md.App. 586
 
 , 590,,
 
 88 A.3d 860
 
 (2014), the defendant, who held the elected position of county executive was convicted after a bench trial of two criminal charges. As part of his sentence, specifically as a special condition of probation, the trial court prohibited the defendant from "be[ing] a candidate for any local, state, or federal elected office."
 
 Id
 
 . (quotation marks omitted; alteration in original). On appeal, the Maryland Court of Special Appeals struck the special condition of probation because "there exists a comprehensive statutory scheme governing the eligibility and removal of public officials in Maryland,"
 

 id.
 

 at 613
 
 ,
 
 88 A.3d 860
 
 , and "the separation of powers precludes trial courts from interfering in areas where the Legislature left the question of eligibility on who may seek elected office to the County Council and the General Assembly."
 
 Id
 
 . at 611,
 
 88 A.3d 860
 
 (quotation marks omitted).
 

 While the prosecution asserts that forcing an individual out of office is quite different from the voluntary resignation that was to occur in this case, the
 
 Richmond
 
 Court found it of no matter that the defendant had voluntarily consented to the plea agreement, stating that "[t]he constitutional protections of legislators and candidates exist not for their personal benefit but to safeguard the rights of the people. A member of Congress may not barter away constitutional protections which belong not to him but to his constituents."
 
 Richmond
 
 ,
 
 550 F.Supp. at 609
 
 (citations omitted).
 

 Further, public policy considerations are significant when plea negotiations involve elected offices. "Even [arm's-length] negotiated commercial contracts between persons of equal power are void if they offend public policy."
 

 Id.
 

 . The
 
 Richmond
 
 court further explained:
 

 The possibility of the executive utilizing the threat of prosecution to force the resignation of a congressional representative involves potentially dangerous political consequences. It represents an opportunity for an assault on the composition and integrity of a coordinate branch of government. Taken together, investigative techniques such as those used in the Abscam cases,
 
 see
 

 United States v. Myers
 
 ,
 
 688 F.2d 817
 
 (2d Cir.1982), the enormous spectrum of criminal laws that can be violated, the powerful investigative and prosecutorial machine available to the executive, and forced resignations through plea bargaining would provide an intolerable threat to a free and independent Congress. [
 
 Richmond
 
 ,
 
 550 F.Supp. at
 
 608 ].
 

 We find the reasoning in
 
 Richmond
 
 persuasive, despite the dissent's position that the case was "wrongly" decided by the federal bench charged with making the decision. It is particularly compelling in light of the substantial similarities between that case and the instant matter. In both the instant case and
 
 Richmond
 
 , the constitution in question provides a singular manner by which a sitting member can be removed from office. In both cases, the remedy was for two-thirds of the members of the body to which the person had been elected to vote for the member's expulsion.
 

 Id.
 

 at 607
 
 . Indeed, the Michigan Constitution contains an additional clause not considered by the
 
 Richmond
 
 court that specifically bars the executive branch from removing members of the legislative branch. Const. 1963, art. 5, § 10.
 

 Likewise, the
 
 Richmond
 
 case and the present case both involve constitutional provisions that set out an exhaustive list of requirements and disqualifiers for a person seeking a position in the legislature. In
 
 Richmond
 
 , there were age, residency, and citizenship requirements, as well as criminal and similar disqualifiers. Similarly, in the present case, the Michigan Constitution contains a list of requirements for a person seeking a state Senate seat, including that the person "be a citizen of the United States, at least 21 years of age, and an elector of the district he represents." Const. 1963, art. 4, § 7. Additionally, the Michigan Constitution lists the types of felonies that disqualify someone from seeking a state Senate seat. Const. 1963, art. 11, § 8 ; Const. 1963, art. 4, § 7. Notably, that list does not include the crime for which defendant was convicted. And in
 
 Richmond
 
 and in this case, both defendants voluntarily entered into plea agreements with provisions concerning their elected seats.
 

 By requiring defendant to resign from his state Senate seat as part of the plea bargain, the prosecution attempted to punish and expel a member of the state Senate, actions that are reserved solely for the Legislature. Const. 1963, art. 4, § 16. Because
 that authority was assigned to the Legislature alone, the prosecution's
 
 offering
 
 of that plea-agreement term was an unconstitutional attempt to violate the separation of powers. Const. 1963, art. 3, § 2. When the prosecution included in the plea bargain the requirement that defendant not seek public office during his five-year probationary period, the prosecution invaded the right of defendant's constituents to "decide upon his moral and other qualifications" when defendant's crimes did not specifically disqualify him under Const. 1963, art. 11, § 8, and Const. 1963, art. 4, § 7.
 
 Richmond
 
 ,
 
 550 F.Supp. at 607
 
 . Likewise, if the judiciary were to enter
 orders with plea conditions like those at issue here, even upon the agreement of the parties, the judiciary would be providing its tacit approval of the terms of the agreement, which would violate the Michigan Constitution. See
 
 Richmond
 
 ,
 
 550 F.Supp. at 609
 
 .
 

 As the
 
 Richmond
 
 court held, allowing the prosecution to engage in such negotiations permits the threat of prosecution and the possibility of imprisonment to be used for nefarious purposes. Tacit permission for prosecutors to engage in such negotiations, even if done innocently at the time, could open the door for the executive branch to use its power of prosecution (and the threat of imprisonment) to remove from elected office those officials who do not align with the political preferences of the executive branch. Indeed, in the present case, the dangers of this practice were specifically observed in defendant's response to the prosecution's motion to vacate the plea.
 

 In response to the prosecution's motion, defendant argued that while he believed the trial court should not vacate the plea, if it intended to do so, he wanted the opportunity to fulfill the terms of the plea agreement to avoid potential prosecution and imprisonment. As can be seen, the mere possibility of prosecution and prison time resulted in defendant's seeking to abandon his state Senate seat to avoid those possibilities. That is just the issue about which the trial court, defendant, and the
 
 Richmond
 
 court expressed concern. "Availability of the technique and the possibilities of its abuse cannot be tolerated."
 

 Id.
 

 . Further, "[t]he prosecutorial practice of dealing in legislative office in negotiations with congressional defendants must be arrested before its potential for abuse is realized."
 
 Id
 
 . In affirming the trial court's decision to strike those terms from the plea agreement, this Court will ensure that future prosecutors
 are aware of the unconditional nature of such negotiations and that the possibility that prosecutors will abuse the plea process will be diminished.
 
 [2]
 

 There is no question that public officials can, and do, voluntarily resign from office for a variety of reasons. For the dissent to suggest that our decision and reasoning necessarily indicate that public officials can never voluntarily resign is nonsensical. An individual's voluntary resignation from public office by that individual's own volition, without a threat of criminal charges being used to compel the resignation, is a drastically different situation
 than the one before us today. When another branch of government, like the executive branch, uses resignation from public office as a bargaining tool, the public office held sheds its cloak of public service and becomes one of service personal to the officeholder and the other branch of government. It diminishes the nature and purpose of the public office and reduces it to a simple tool used solely to better or worsen an officeholder's position in the criminal justice system. In addition, as the dissent points out, "[a]n elected officeholder should be treated no differently than any other citizen" as it relates to plea negotiations. If resignation from public office is used as a potential plea-negotiation tool, that equality is gone and the executive branch is effectively recognizing a
 second class of citizens-an elected class with an additional advantage with which to bargain.
 

 Moreover, in the present case, the fact that defendant was willing to voluntarily relinquish his state Senate seat and to refrain from seeking public office during probation is entirely irrelevant to the issue presented here. Defendant did not have the constitutional right to use his elected office as a bargaining chip because the constitutional rights associated with his office were not for his individual benefit but for the benefit of the people who elected him. Allowing the prosecution to engage in this type of negotiation (using prosecution and possible imprisonment in exchange for a resignation and a promise not to seek elected office) and then call the agreement "voluntary" falls well within the problem of coercion about which the
 
 Richmond
 
 court expressed concern. We have the same concern. Therefore, the prosecution's argument in that vein is without merit.
 

 The trial court properly determined that the terms of the plea agreement requiring defendant to resign from his state Senate seat and to not seek public office for five years were unconstitutional. The trial court properly struck those portions of the plea agreement before entering the judgment of sentence. That being the case, we must next determine whether the trial court abused its discretion when it denied the prosecution's motion to vacate the plea agreement.
 

 Pursuant to MCR 6.310(E), "[o]n the prosecutor's motion, the court may vacate a plea if the defendant has failed to comply with the terms of a plea agreement." This Court has held that "the prosecutor has an equal right to withdraw from a plea agreement" because "the people, no less than the defendant, should be able to receive the benefit of the agreed-upon
 bargain[.]"
 
 People v. Siebert
 
 ,
 
 201 Mich.App. 402
 
 , 413,
 
 507 N.W.2d 211
 
 (1993). " 'The authority of a prosecutor to make bargains with defendants has long been recognized as an essential component of the efficient administration of justice.' "
 
 People v. Martinez
 
 ,
 
 307 Mich.App. 641
 
 , 651,
 
 861 N.W.2d 905
 
 (2014), quoting
 
 People v. Jackson
 
 ,
 
 192 Mich.App. 10
 
 , 14-15,
 
 480 N.W.2d 283
 
 (1991). "In light of the prosecutor's expansive powers and the public interest in maintaining the integrity of the judicial system, agreements between defendants and prosecutors affecting the disposition of criminal charges must be reviewed within the context of their function to serve the administration of criminal justice."
 
 Jackson
 
 ,
 
 192 Mich.App. at 15
 
 ,
 
 480 N.W.2d 283
 
 . "[W]hile analogous to a contract, plea bargains are not governed by the standards of commerce but must comport with the interests of justice in the administration of criminal laws."
 
 Martinez
 
 ,
 
 307 Mich.App. at 651
 
 ,
 
 861 N.W.2d 905
 
 . "In other words, contractual theories will not be applied if to do so would subvert the ends of justice."
 
 People v. Swirles (After Remand)
 
 ,
 
 218 Mich.App. 133
 
 , 135,
 
 553 N.W.2d 357
 
 (1996).
 

 Consonant with the law just cited, the question this Court must consider is whether the trial court abused its discretion when it determined that permitting the prosecution to withdraw the plea would "subvert the ends of justice."
 
 Id.
 
 at 135. We find that voiding the portions of the plea agreement that were unconstitutional while accepting the rest of the agreement "serve[d] the administration of criminal justice."
 
 Jackson
 
 ,
 
 192 Mich.App. at 15
 
 ,
 
 480 N.W.2d 283
 
 .
 

 As previously discussed, the prosecution's proposition was dangerous. It offered to forgo the prosecution of crimes that could ultimately result in at least two years of imprisonment (given the felony-firearm
 charge) in exchange for, among other things, defendant's resigning his state Senate seat and refraining from holding public office. Not only was the offer unconstitutional, it also carried with it the possibility of abuse by future prosecutors. It is not hard to extend the scope of the prosecution's actions in this case to include a situation in which a prosecutor might go on a fishing expedition against a political opponent, threaten to charge the opponent with serious felonies, and then provide a "voluntary" escape from the threat by conditioning the escape on the opponent's agreement to give up his or her position in the Legislature and to not run in the future. Allowing the prosecution in the present case to make that offer, reach an agreement, and then simply have another chance at negotiation after the trial court struck the unconstitutional parts of the agreement would send the wrong message. If a prosecutor is aware that using the threat of criminal charges against a member of the legislative branch will only be punished by allowing the prosecutor to go back to the negotiating table after the courts discover the wrongdoing, there will be little impetus to stop the practice. Losing the benefit of the bargain after making such an agreement, however, would send the message that these actions, which involve unconstitutional coercion, are better to be avoided entirely. Given that analysis, it is logical to conclude that the trial court's order refusing to allow the prosecution to vacate the plea was entered in order to "serve the administration of criminal justice."
 
 Jackson
 
 ,
 
 192 Mich.App. at 15
 
 ,
 
 480 N.W.2d 283
 
 . Deciding otherwise would send a clear message to the prosecution that making such an agreement only carries the risk of having to start over with the negotiations.
 

 Additionally, in the present case (and it is not hard to see similar circumstances in future cases) defendant
 was in a much worse bargaining position after the plea was accepted by the trial court. The prosecution then knew that defendant was willing to make a plea, defendant revealed the location of the weapon used during the crime as a condition of the plea, and defendant has since voluntarily resigned his state Senate seat. Permitting the prosecution to go back to the negotiating table with such advantages after it entered an unconstitutional plea agreement would undoubtedly "subvert the ends of justice."
 
 Swirles
 
 ,
 
 218 Mich.App. at 135
 
 ,
 
 553 N.W.2d 357
 
 . Also of importance, defendant was not left entirely unpunished as a result of the trial court's decision. Defendant was still required to serve (and did serve) 10 months in the Wayne County Jail without the possibility of early release and five years of probation, in addition, defendant is required to submit to alcohol and drug treatment with monthly documentation, had to submit to a mental health evaluation and fully comply with treatment, and pay full restitution.
 This Court finds that the trial court did not abuse its discretion by denying the prosecution's motion to vacate the plea.
 

 Affirmed.
 

 M. J. Kelly, J., concurred with Servitto, J.
 

 We note that despite the trial court's rulings, defendant in fact voluntarily resigned from his seat in the Michigan Senate effective April 12, 2016. Although defendant previously argued that the trial court's vacating the portion of the plea agreement requiring him to not seek elected office during his five-year probationary period was not yet ripe for review, it has come to our attention that defendant is currently running for a public office. Moreover, even if he were not, there is an "actual, existing controversy" because the trial court's act of striking certain terms from the plea agreement as unconstitutional, while approving the rest of the agreement, formed a "real and immediate threat" to the prosecution's interest. See,
 
 People v. Conat
 
 ,
 
 238 Mich.App. 134
 
 , 145,
 
 605 N.W.2d 49
 
 (1999).
 

 The dissent lightly dismisses the potential of prosecutors misusing the office (e.g., referring to "public policy doomsday hyperbole" and "the imaginary specter of prosecutors running amok"). However, we would be remiss if we did not point out that this Court was made aware that in direct response to this case, the Wayne County Prosecutor's office, at least temporarily, instituted a policy of "no plea offers" to
 
 all
 
 defendants appearing before the trial court judge assigned to the instant matter. This conduct not only raises constitutional implications, it firmly establishes that the executive branch does, in fact, have the ability and potential to use its power in ways that are contrary to public policy.